KAZIMIERZ TEBIN et al., Appellants, v. JANINA MOLDOCK, Respondent.

First Department, July 9, 1963.

*Paul L. Ross* of counsel (*Wolf Popper Ross Wolf & Jones,* attorneys), for appellants.

*Edward J. Bloustein* of counsel (*Irving Payson Zinbarg,* attorney), for respondent.

BREITEL, J. P. Plaintiffs appeal from a judgment dismissing their complaint after a trial without a jury. Plaintiffs are the son, sister and two brothers of a New York decedent, all of whom are residents of Poland. Defendant is decedent's niece, and a native-born American. Decedent emigrated to the United States from Poland in 1913. She died in 1956, a widow, leaving only plaintiff son as a surviving descendant. The action was to impose a constructive trust, in favor of plaintiffs, of certain funds deposited in savings institutions, and a multiple dwelling. The assets had once belonged to decedent but she, in the last five years of her life, had transferred them to defendant niece.

Plaintiffs charged defendant with having obtained the assets by fraud and undue influence and by promises made to hold the property for the benefit of plaintiff son. The assets were transferred *inter vivos* by account transfers, drafts, and in the case of the real property, by deed. Decedent also left a will by which she devised and bequeathed her entire estate to defendant niece, but at her death all her assets had already been transferred *inter vivos.*[*]

The trial court in an oral decision found that the transfers were voluntary and uninfluenced by fraud or undue influence, and that they were the natural result of decedent's love and affection for defendant niece. Impliedly, the court found that no promises, expressed or implied, had been made, sincerely or not, upon which a constructive trust could or should be based.

For the reasons which will appear, the judgment dismissing the complaint should be reversed and an appropriate judgment should be directed providing for a constructive trust to be imposed on the remaining assets of decedent in the hands of defendant niece. While the evidence does not establish fraud or undue influence, it does inescapably establish that the assets were transferred on certain promises to hold for the benefit of the son, which promises were made in a confidential relationship. These promises were relied upon, and for their breach equity is bound to provide appropriate relief.

### The Background Facts

Hermina Tebin, the decedent, was born in Poland in 1882. She married there, but later separated from her husband, left her two sons with her parents, and emigrated to the United

---

[*] The will was offered for probate and plaintiff son, as contestant, filed objections. The probate proceeding was stayed by this court pending determination of this action (*Matter of Tebin,* 7 A D 2d 720).

States in 1913. One son died in 1920 without issue. The other, who was born in 1904, is the first-named plaintiff in this action.

Since coming to this country decedent lived in New York City, earned her livelihood as a midwife, acquired the lower east side multiple dwelling in which she lived, and accumulated cash funds in the amount of about $19,000. During this period of over 40 years, she saw her son in Poland once when she travelled there in 1928, and stayed for some two months. She maintained an intermittent correspondence with him throughout and until the end of her life. During this period decedent lived with a man for many years, until he died in 1949.

In 1920, decedent brought her sister Aniela to the United States. After Aniela married she lived for a period in decedent's house but eventually moved to a farm in New Jersey. Defendant niece is Aniela's daughter, whom decedent knew as a growing child, befriended and assisted as a young woman training for an educational career, and who, in decedent's later years, handled her moneys and affairs when illness and age closed in.

Sometime in 1947 decedent became ill with cardiovascular disease. It followed a fluctuating course with intermittent hospitalization, but also with interim periods of satisfactory accommodation, until the onset of the final illness. Prior to her first illness she had established trust accounts in savings institutions for her son, a sister, and for two brothers, all in Poland.

Starting in 1951 two of the five savings accounts were converted into trust accounts (Totten trusts) in favor of the niece, and the remaining three were progressively drawn down with the bulk of the withdrawals passing to the niece outright. In December, 1951 the real property was transferred in absolute form to the niece, but a letter agreement was subscribed by the niece in which it was provided that decedent should retain the use, free, of her apartment, and receive for her life the net income from the property less a management fee to the niece. The letter recited that the niece was the sole and entire owner of the property.

In August, 1951, decedent made a will in which the niece was named as the sole beneficiary of her estate. It contained the following clause: " Third: I have given certain oral instructions to my said niece, with respect to my son Kazimierz Tebin, and having full faith and confidence in her honesty and integrity, I feel certain that she will carry out my instructions. Nonetheless, in the event that she fails to carry out my instructions, it shall be a matter for her own conscience and not otherwise."

As decedent's end approached, the niece handled more and more of the aunt's affairs, faithfully, and paid all her expenses of living, hospitalization and medical services, out of the funds theretofore transferred to the niece. After the aunt's death, the niece from the same sources paid the funeral expenses.

During decedent's lifetime she sent small sums and package gifts to her son and to the other relatives in Poland. After decedent's death, the niece sent the son some money, but she refused, after this action was begun, to send him $200 he had asked for earlier.

Presently, the niece holds the real property and about $14,000 of roundly $19,000 transferred to her.

### Plaintiffs' Claims

Plaintiffs assert that the niece and her mother frightened decedent with the representation that if any assets were ever received by the son, he being in a Communist country, the assets would be taken from him and that Stalin would kill him. By these devices decedent was induced to transfer the assets to the niece. Again, they quieted decedent, when she later became mistrustful and sought return of the assets even to the point of decedent consulting a lawyer for that purpose.

Plaintiffs also claim that the assets were transferred to the niece on her promise that she would hold them for decedent's son and advance funds as he needed and could profitably use them.

### The Defense

The niece and her mother assert that the relation between the decedent and her son was not a close one, that decedent often complained of the greediness of the son and his persistent and exclusive interest in receiving remittances and gifts. Moreover, it is asserted that the niece was to send moneys to the son only in her exclusive discretion and judgment, and never in excess of $25 in any one month. It is pointed out that the niece was the godchild of decedent, the relationship intimate, and that the educated American-born niece was the special pride and object of affection of decedent. In short, the gifts were absolute; there were no promises except acquiescence in precatory requests of minimal effect in relation to the assets involved.

### Undue Influence

Supporting the claim of fraud and undue influence, plaintiffs rely on comments in letters written by decedent to her son and sister in Poland, and the testimony of two lawyers. They also rely on transfers of savings funds occurring while decedent was

in the hospital, under heavy medication, and while under a disputed diagnosis of senile psychosis.

The trial court properly rejected these claims. While there is evidence to support them, it is not sufficiently clear. Decedent was a wily suspicious woman who used lawyers, and lawyers to check on her lawyers, and laymen to check on the lawyers. She undoubtedly changed her mind from time to time and she certainly, at one time, became mistrustful of the wisdom of the transfers she had effected. There were undoubtedly loose and cynical conversations about the implications for a resident in a Communist-dominated country, and the greed of seekers of remittances abroad. Indeed, one may accept that these conversations occurred, and yet the proof falls short of showing a pattern of conduct or circumstances establishing a scheme to defraud or exercise duress or undue influence. Since, in this respect, the trial court is sustained, no useful purpose would be served in detailing the interesting but indeterminate proof and contentions.

Notably, the evidence offered under the claim of undue influence, while insufficient for that purpose, supplies relevant circumstance and condition in finding the alleged promises.

### The Promises

As indeterminate as is the proof of fraud and undue influence, so it is clear by documents, reliable witness testimony, and circumstances that the niece made or acquiesced in promises which induced the transfers of assets. Indeed, her testimony confirms pivotal facts. On this proof it is evident that the transfers were made in reliance upon the promises made by a niece, dear to and trusted by decedent. The extent of the arrangements is a matter of concern and difficult to determine from the record; but the law is not to be frustrated because the whole truth is not available from the trusted one if it be clear and convincing enough that discernible promises, made in a confidential relationship, have been broken or repudiated, and the trusted one will be unjustly enriched by reason of the breaches.

At this point it is appropriate to turn to the evidence supporting a finding of a breach of promise in and induced by the confidential relationship. There should be recalled, initially, the letter agreement which accompanied the deed transfer to the real property and the precatory clause in the will. These bespeak arrangements apart from the absolute gifts and transfers. By themselves they would not suffice to impair the absolute title of the niece. But there is much more.

## Maday Testimony

The deed to the real property, dated and executed December 11, 1951, was prepared, and its execution supervised by an attorney, Mr. Maday, retained by decedent. He testified that decedent told him of the Stalin conversations; that she wanted her son to receive her estate; that she had an understanding with her niece to whom she was going to transfer her property and who would carry out her wishes. He says he repeated the understanding about the ultimate use of the assets to the niece and the niece said she agreed. He told decedent that he was opposed to such a transfer and asked her to think it over for two weeks. The niece confirms that he asked decedent to think the matter over. Without waiting the full period the two women returned to him, decedent insisting on going through with the plan. He prepared the letter that was executed at the same time as the deed. He, concededly, sent the niece two letters, in December, 1951 and February, 1952, urging her to write a will, and in the first letter he said, '' It might be desirable for you to have me do this in view of the fact that I am familiar with the situation between your aunt and yourself.''

Mr. Maday's testimony was rejected by the trial court as incredible. Nevertheless, it and the confirming documentation compel a conclusion that there was a secret arrangement. Albeit thus far alone, if Mr. Maday's testimony were given no weight at all, it would not be clear whether it was a secret arrangement for the benefit only of the decedent or for the benefit of decedent and her son. This much, however, should be evident: so long as decedent was using lawyers, if only her own lifetime needs were concerned, there was no need and no advantage in a secret arrangement, and there was every disadvantage.

## Solon Testimony

In July, 1952 decedent came to Mr. Solon, a lawyer, and retained him to recover her property. He wrote a demand letter to the niece, which the niece took to Mr. Maday and discussed with him. Decedent had told Mr. Solon the Stalin story and that she had transferred the assets to the niece to provide her lifetime needs and to take care of her son. While there were some ensuing conversations about bringing a lawsuit nothing further was done to prosecute the matter. The trial court never expressly rejected Mr. Solon's testimony as it did that of Mr. Maday, although the one corroborated the other.

## The Niece's Testimony

The niece testified that decedent told her: " that she was an older woman, that she wanted someone who would take care of her, who would look after her needs while she was alive * * * She spoke to me also about her son, and she said that all during her lifetime he had always written to her and asked her to help, and that since she was giving me everything she had, she thought that he probably would, after her death, seek me out and ask me for help, and she asked me to see that he never got his hands on any lump sum of money. That is why she was giving it to me. But she knew that if he would write to me and ask me for help, and if I felt that he needed it, that I would help him." Also: " ' I have given everything to you now. He no doubt is going to turn to you later, when I am gone.' And here again she said, ' I never want you to give him more than $25 in any one month and only when he writes to you that he needs it and he wants it.' " Asked if she agreed to this the niece answered only: " She said no more than $25 in any one month, if he writes to me for it. And, in fact, later I did send him some money."

The niece, of course, denied so much of the conversation with Mr. Maday as involved any promises or understanding to take care of the son. She admitted receiving the letters from Mr. Maday and the demand letter from Mr. Solon. She also testified that she went to see Mr. Maday about Mr. Solon. She also discussed it with decedent: " Well, she said, ' I went to the lawyer because I want you now to return this to me. I gave it to you, but I want you to return it to me.' And I didn't understand why, why she had changed her mind, because she had been so absolutely adamant about this. She had said that ' I want you to have it.' I had — when she wanted to transfer the house to me, in fact I didn't want her to at the time because I felt that I was going to have a legal responsibility at the time whereas the situation would still be the same, she was living in the house, she was collecting the rents, and I felt, I don't know if that is correct or not. I am no lawyer, but I felt that I had a legal responsibility, so I had asked her if she wanted me to have it, why doesn't she make out a will."

The will was given to the niece after this conversation, according to the niece, but it contained the precatory clause and the reference to instructions about the son. It was still another lawyer, Mr. Goldman, who, in August, 1951 drew the will. He said that decedent had given the niece oral instructions but that decedent did not tell him what they were. Neither did she tell him of a plan to make *inter vivos* transfers to the niece.

## Decedent's Letters

In August, 1952 decedent wrote to her son in Poland:

"I was very sick with my heart and Aniela and her daughter, Janina scared me by telling me that if I leave my estate to you Stalin will take it away from you after I die and that you will be forced to sign your name that you have received everything and then you may be shot to death. So I gave all to Janka — $14,000 and a house and now they are trying to commit me to an insane asylum so they could keep everything for themselves. I will try to have you come here and take it all back because they stole it from me by fraud and they bribed the lawyer.

"Keep this letter so that you could appear as a witness if necessary. Or perhaps she will return it to me of her own free will because she told me that whenever I will want it back she will give it to me but I have already caught them in stealing."

In November, 1952, she wrote again:

"My dear son:

"I am very sorry that I have permitted myself to be coaxed into entrusting my estate to her although I do not believe that she will try to cheat me out of it. She assures me that it belongs to me and that if I, her aunt, will want it back she will return my property to me. We will have to wait and see. As regards the lawyers — they could not be trusted. She was born here and could bribe them to do what she wanted them to do. This must be dealt with patience and goodness, otherwise nothing could be achieved. Don't worry, everything will turn out to the best. My love to you,"

## The Secret Arrangement

It is evident, beyond persuasive contradiction, that a secret arrangement had been effected between aunt and niece for the benefit of the aunt during her lifetime, and the son. The documents prove it; the testimony of the lawyers proves it; and, finally, the circumstances confirm the conclusion. Even the trial court's summary and unjustified rejection of the testimony of one of the lawyers does not cancel the impact of what remains of lawyer testimony.

Actually, the trial court's discredit of Mr. Maday and harsh strictures were not justified. Indeed, much of his testimony is supported by that of other witnesses, and particularly by the documentation.

Most importantly, the largely truthful testimony of the niece confirms the existence of a secret arrangement for the benefit of both decedent and her son.

## The Applicable Law

In a commendably frank and able brief defendant does not dispute the applicable law. Thus, she says: "There is no dispute concerning the law of constructive trusts applicable to this case. It is well established that, where property has been transferred as the result of fraud or duress, or where it has been transferred in abuse of a confidential relationship, the courts will impose a constructive trust on the property held by the transferee. (See, e.g., *Katzman* v. *Aetna Life Ins. Co.*, 309 N. Y. 197, 203; *Latham* v. *Father Divine*, 299 N. Y. 22, 27; *Beatty* v. *Guggenheim Exploration Co.*, 225 N. Y. 380, 386; *Sinclair* v. *Purdy*, 235 N. Y. 245, 253; *Farano* v. *Stephanelli*, 7 A D 2d 420, 424–425.)"

Her quarrel is only with whether the proof is sufficient, the burden of proof being on the one who claims the existence of a constructive trust.

The proof is ample, for the reasons already indicated, and the evidence truly speaks for itself. Moreover, the rule is a broad one. It suffices that the one who entrusted property did so because of certain understandings, and the one to whom the assets are given acquiesced even in silence (e.g., *Sinclair* v. *Purdy*, 235 N. Y. 245, 253–254; *Fairchild* v. *Edson*, 154 N. Y. 199, 218; *Amherst Coll.* v. *Ritch*, 151 N. Y. 282, 324; *Matter of O'Hara*, 95 N. Y. 403, 412–413; *Farano* v. *Stephanelli*, 7 A D 2d 420, 424–426). Thus, in the *Edson* case it was said (p. 218): "The express promise in words is not necessary — silent acquiescence and tacit consent have all the force and effect of a promise solemnly made in the presence of witnesses." (To like effect, see, Bogert, Trusts and Trustees [2d ed.], § 496; 89 C. J. S., Trusts, § 139, p. 1020.)

Given the secret arrangement made in a confidential relation, and breach of the promise, of which repudiation is a species, equity will impose the device of a constructive trust (e.g., *Matter of O'Hara, supra*; *Wood* v. *Rabe*, 96 N. Y. 414, esp. 425–426; *Fairchild* v. *Edson, supra*; *Amherst Coll.* v. *Ritch*, 151 N. Y. 282, 323–325, *supra*; *Sinclair* v. *Purdy, supra*; *Farano* v. *Stephanelli, supra*; 89 C. J. S., Trusts, § 139). To be sure, the situation may be strikingly different, when there is no breach or repudiation by the trusted one (*Matter of Warren*, 11 N Y 2d 463).

In dealing with the problem of a secret trust or the breach of a confidential relationship the ordinary rules imposed by the Statute of Frauds, the Statute of Wills, the parol evidence rule, and that governing statements in derogation of title, are not applicable. Equity in this area has always reached beyond the

facade of formal documents, absolute transfers, and even limiting statutes on the law side. In *Amherst Coll.* v. *Ritch* (*supra*) the Court of Appeals quoted with approval from *Wallgrave* v. *Tebbs* (2 K & J 321) as follows (p. 325): "Where a person knowing that a testator, in making a disposition in his favor, intends it to be applied for purposes other than his own benefit, either expressly promises or by silence implies that he will carry the testator's intention into effect, and the property is left to him upon the faith of that promise or undertaking, it is in effect a case of trust; and in such a case the court will not allow the devisee to set up the Statute of Frauds — or rather the Statute of Wills, by which the Statute of Frauds is now in this respect superseded, and for the reason that the devisee by his conduct has induced the testator to leave him the property; and, as Lord Justice TURNER says in *Russell* v. *Jackson,* no one can doubt that if the devisee had stated that he would not carry into effect the intentions of the testator, the disposition in his favor would not have been found in the will. But in this the court does not violate the spirit of the statute, but for the same end, namely, prevention of fraud, engrafts the trust on the devise by admitting evidence, which the statute would in terms exclude, in order to prevent a party from applying property to a purpose foreign to that for which he undertook to hold it." Indeed, the New York statute requiring a writing for conveyances of real property expressly exempts trusts arising "by implication or operation of law" (Real Property Law, § 242). (See, also, *O'Boyle* v. *Brenner,* 189 Misc. 1058, 1060–1062, mod. on other grounds 273 App. Div. 683, 278 App. Div. 900, mod. 303 N. Y. 572, involving notes written by testatrix; *Sinclair* v. *Purdy,* 235 N. Y. 245, 250, 252, *supra*; *Latham* v. *Father Divine,* 299 N. Y. 22, 28–29; *Amherst Coll.* v. *Ritch,* 151 N. Y. 282, 323, 325–327, *supra,* involving memoranda written by testator; 89 C. J. S., Trusts, §§ 140, 141, 157.)

The precatory terms of the will ("in the event that she [defendant] fails to carry out my instructions, it shall be a matter for her own conscience, and not otherwise") do not preclude the finding of a constructive trust. Constructive trusts have been enforced in face of such language before (e.g., *Fairchild* v. *Edson,* 154 N. Y. 199, 218–219, *supra*; *Matter of Arnold,* 4 Misc 2d 970, 971, 974–976, affd. 3 A D 2d 998). When the court finds, as it does here, that a disposition, otherwise absolute, rests on a secret arrangement, the absoluteness of the disposition as written cannot preclude a judicial decree based on things as they were intended, rather than on things as they seemed.

It may be true that decedent did not intend her son to receive the assets outright or in any sizable allotments. It is also true that the niece was obligated to advance substantial sums for the benefit of decedent, and that she did so faithfully. For this she is entitled to credit.

Research has not yielded direct precedent for the fashioning of a constructive trust on the pattern of a true trust, although broad language in cases and commentary would permit of the greatest "flexibility" and "variety" (see text and cases collected at 89 C. J. S., Trusts, p. 1020, and at 65 C. J., Trusts, p. 457; also, see, *Latham* v. *Father Divine*, 299 N. Y. 22, 27, *supra*; *Foreman* v. *Foreman*, 251 N. Y. 237, 242; *Beatty* v. *Guggenheim Exploration Co.*, 225 N. Y. 380, 386, 389). The conceptual problem persists, however, that, traditionally, a constructive trust is viewed as merely a restitutional remedy, not imposing fiduciary status on the constructive "trustee" beyond the duty to convey the property unjustly held (e.g., Restatement, Restitution, § 160, Comment a; Pound, Progress of the Law — Equity, 33 Harv. L. Rev. 420, 420–423; Scott, Constructive Trusts, 71 L. Q. Rev. 39, 40–41).

True, merely to transfer the assets absolutely and as a whole to the son may not meet the conditions contemplated by decedent or all the terms of the secret arrangements between decedent and defendant niece. To that extent the ordinary restitutional treatment of a constructive trust does not accomplish the flexible and varied equity of which the courts have spoken. It would seem, however, in the light of the precedents, the principles upon which they rest, and the practical difficulties, that it would be injudicious for the court to fashion the trust that decedent should have. Too much speculation would be involved, and too much judicial arrogation of the testamentary power.

On the practical side, a difficult problem would be determining the level of income or extent of principal which should be made available to the son. The most difficult problem would be the disposition of any residue, if any sort of limited trust were judicially devised in the guise of a constructive trust. Consequently, the son is entitled to the assets under the traditional concepts of a constructive trust.

Moreover, the son would, as the sole surviving child of a widow, receive the assets in the event of intestacy. Upon failure of the trust and the will, there would be a reverter of the assets to the estate of decedent, and a constructive trust would be imposed on the residuary legatee for the benefit of the distributee. Consequently, there would be no difference in practical result.

As to the power of plaintiff son to enjoy the benefit of any distribution, section 269-a of the Surrogate's Court Act could be made applicable. Under recent decisions it has been held that the Polish regime does not prevent such enjoyment (e.g., *Matter of Swiderski,* 29 Misc 2d 480; *Matter of Tybus,* 28 Misc 2d 278; *Matter of Doktor,* 18 Misc 2d 223).

However, in any event, there must be an accounting in order that the niece be credited with the sums she advanced on behalf of decedent.

Accordingly, the judgment dismissing the complaint should be modified, on the law and the facts, to the extent of granting judgment in favor of plaintiff son, Kazimierz Tebin, providing for a constructive trust in his favor against defendant niece, and for an accounting, together with such other and further proceedings at Special Term as may be appropriate in accordance with the views expressed in this opinion, and the judgment, to the extent that it is not reversed, should be affirmed, with costs to plaintiff son payable out of the funds of the estate, without any costs to any other parties. Settle order.

McNALLY, J. (dissenting in part). I dissent, in part, and vote to reverse and order a new trial solely on the issue of the nature and extent of the son's necessities with an appropriate judgment to be entered providing for a constructive trust in an amount found to be sufficient to meet these necessities to be imposed on the remaining assets of the decedent in the hands of the defendant niece with the remainder to the niece on the death of the son.

The record sustains the finding that decedent's primary purpose was to provide for the son's necessities; that she was frustrated in the belief that the son, a Polish national, would be prevented from enjoying the benefit of her estate by reason of what decedent believed to be restrictions on ownership and use of property by Polish nationals. Decedent therefore, relying on the integrity of her niece, transferred all her property to this young woman. There is no question of an arrangement between decedent and the niece, the precise nature of which has not been reduced to writing. The testimony of the niece confirms the purpose of the decedent to make provision for the son and inasmuch as she is an interested witness the alleged monetary limitation for the payment of $25 on any one occasion is not binding. I do not find Mr. Maday's testimony incredible; in fact, with the confirming documentation it compels the conclusion of the existence of a secret arrangement.

Since the dominant purpose of decedent was to provide necessities for the son, it is possible to frame a judgment directing

an accounting and providing for a deposit in court, if necessary, subject to the use and application of the son upon appropriate proof establishing that the son will have the full benefit and enjoyment of any payment made. This provision is consistent with the public policy expressed in section 269-a of the Surrogate's Court Act, which is to protect foreign legatees to the extent of preventing the appropriation of legacies by foreign governments.

RABIN, EAGER and BASTOW, JJ., concur with BREITEL, J. P.; McNALLY, J., dissents in part in opinion.

Judgment dismissing the complaint modified, on the law and the facts, to the extent of granting judgment in favor of plaintiff son, Kazimierz Tebin, providing for a constructive trust in his favor against defendant niece, and for an accounting, together with such other and further proceedings at Special Term as may be appropriate in accordance with the views expressed in the opinion of BREITEL, J. P., filed herein, and the judgment, to the extent that it is not reversed, affirmed, with costs to plaintiff son payable out of the funds of the estate, without any costs to any other parties. Settle order on notice.